UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| ROBERTA ANNE HOOKE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 13-11557-JLT |
| CAROLYN W. COLVIN, | * | |
| Acting Commissioner of the Social | * | |
| Security Administration, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM

May 16, 2014

YOUNG, J.

I.     Introduction

Roberta Anne Hooke ("Hooke") brings this suit pursuant to 42 U.S.C. § 405(g) seeking

review of the Social Security Administration's ("the Administration") rejection of her

application for Disability Insurance Benefits ("DIB"). Presently before this Court are Hooke's

Motion to Reverse and Remand to the Social Security Administration [#15] and the

Administration's Motion to Affirm the Commissioner's Decision [#19]. For the reasons set forth

below, Hooke's Motion to Reverse and Remand is DENIED and the Administration's Motion to

Affirm is ALLOWED.

II.    Background

A.     Procedural History

Hooke filed an application for DIB on April 15, 2009.[1] Hooke claimed that she became

disabled on July 23, 2007.[2] Hooke's application was denied initially on August 28, 2009, and

---

[1] Tr. 168-71, 183 [#8-5].

again upon reconsideration on November 13, 2009.[3] Hooke filed a request for a hearing before an Administrative Law Judge ('hearing officer') on November 20, 2009.[4] That hearing was held on May 4, 2011.[5] The hearing officer heard testimony from Hooke and a vocational expert.[6] On July 26, 2011, the hearing officer issued a decision finding that Hooke was not disabled during the relevant time frame.[7]

On March 25, 2013, the Appeals Council denied Hooke's request for review of the hearing officer's decision, making that decision the final decision of the Commissioner.[8] On June 1, 2013, the Appeals Council granted Hooke's request for additional time to file a civil action.[9] Hooke filed this action seeking review of the Commissioner's decision on June 29, 2013.

B.     Hooke's Background and Medical History

Hooke was born on July 23, 1952 and was fifty-five years old during the period between the alleged onset date of her disability and her date last insured.[10] Hooke has a high school education and no other vocational training.[11]

---

[2] Tr. 183 [#8-5].

[3] See Tr. 75-76 [#8-3]; Tr. 77-79, 81-83 [#8-4].

[4] Tr. 84 [#8-4].

[5] See Tr. 27-74 [#8-2].

[6] Tr. 27-28 [#8-2].

[7] Tr. 14-26 [#8-2].

[8] Tr. 4-7 [#8-2].

[9] Tr. 1-2 [#8-2].

[10] Tr. 34 [#8-2]; Tr. 168 [#8-5].

[11] Tr. 34 [#8-2]; Tr. 205 [#8-6].

Hooke has a history of headaches and began visiting a neurologist, Dr. Mazen Eneyni, about them in 1999.[12] On October 5, 2004, Eneyni indicated that Hooke had been having about six headaches a month but more recently had been getting a headache every day.[13] Eneyni wrote that these were migraine headaches without aura and with high frequency.[14] He prescribed a number of medications to treat the headaches.[15] Hooke underwent an MRI on October 15, 2004.[16] Eneyni wrote that the MRI revealed "punctate nonspecific white matter lesions" but that the exam was "normal."[17] He diagnosed Hooke with migraines and recommended that she continue her medication.[18] Eneyni also discussed with Hooke the potential need for a lumbar puncture at some point in the future.[19]

On December 7, 2006, Hooke was still experiencing migraines and tension headaches.[20] Notes from Angels Neurological Centers ("Angels") indicated that these headaches were being alleviated with Percocet.[21] Hooke reported feeling well overall. On March 7, 2007, Hooke

---

[12] Tr. 480 [#8-8].

[13] Tr. 470 [#8-8].

[14] Tr. 470 [#8-8].

[15] Tr. 470 [#8-8].

[16] Tr. 471 [#8-8].

[17] Tr. 471 [#8-8].

[18] Tr. 471 [#8-8].

[19] Tr. 471 [#8-8].

[20] Tr. 472 [#8-8].

[21] Tr. 472 [#8-8].

reported experiencing headaches every day with a pain level of ten out of ten.[22] On that date, however, she reported only tension headaches and no migraines.[23]

Hooke visited Angels on August 28, 2007 complaining of tension and migraine headaches.[24] She reported that she was experiencing tension headaches every day and migraines two to three times per week.[25] In addition to the headaches, Hooke also reported that she was experiencing chest pains and depression.[26] She also reported nausea, photophobia, and phonophobia.[27] At that time, however, she denied experiencing "back pain, joint pain, joint swelling, muscle cramps, muscle weakness, stiffness, arthritis, sciatica, restless legs, leg pain at night, and leg pain with exertion.[28] She further denied experiencing memory loss and confusion.[29] At one point, the notes also stated that Hooke denied experiencing nausea, although earlier they indicated that she *was* experiencing nausea.[30] The examining physician noted that Hooke had no focal deficits, and that she had normal reflexes, coordination, and muscle

---

[22] Tr. 473 [#8-8].

[23] Tr. 473 [#8-8].

[24] Tr. 474 [#8-8].

[25] Tr. 474 [#8-8].

[26] Tr. 475 [#8-8].

[27] Tr. 474 [#8-8].

[28] Tr. 475 [#8-8].

[29] Tr. 475 [#8-8].

[30] Tr. 474-75 [#8-8].

4

strength.[31] The physician also noted that Hooke was alert and cooperative; had normal mood and affect; and had normal attention span and concentration.[32]

Hooke underwent bilateral knee x-rays on October 22, 2007 at Compass Radiology.[33] The x-rays indicated that Hooke may have been experiencing minimal narrowing of the medial compartments of both knees.[34] Hooke again visited Angels on November 26, 2007 regarding her headaches.[35] During that visit Hooke reported that she was still experiencing daily headaches but was "not getting migraines often."[36] She described the headaches as "dull and achy."[37] The examination notes indicate that at some point Hooke had been diagnosed with periventricular leukomalacia.[38] Hooke had been taking a number of medications, including Keppra.[39] Hooke reported experiencing an increase in memory difficulties, including putting freezer items in the refrigerator and forgetting where things were.[40] The physician's notes suggest that Hooke had

---

[31] Tr. 476 [#8-8].

[32] Tr. 476 [#8-8].

[33] Tr. 332 [#8-7].

[34] Tr. 332 [#8-7].

[35] Tr. 480 [#8-8].

[36] Tr. 480 [#8-8].

[37] Tr. 480 [#8-8].

[38] Tr. 480 [#8-8].

[39] Tr. 480 [#8-8].

[40] Tr. 480 [#8-8].

reported these effects on September 6.[41] Keppra was discontinued and her memory improved to a degree.[42] The same notes indicate, however, that Hooke denied memory loss and confusion.[43]

During the November 26 visit, Hooke also reported feeling depressed.[44] An examination revealed that Hooke had normal memory and orientation, was alert and cooperative, and had normal attention span and concentration.[45] Hooke once again denied back pain, joint pain, joint swelling, muscle cramps, muscle weakness, stiffness, arthritis, sciatica, leg pain, and difficulty walking.[46] The physician noted that she had normal gait and reflexes.[47] The notes indicated that Hooke had previously been treated with GO nerve blocks for her headaches, which showed some improvement.[48] The notes also indicated that Hooke had previously been prescribed a number of different medications which either did not help or had side effects.[49]

Hooke visited Angels again on November 30, 2007. She complained of migraine headaches, memory difficulties, and confusion.[50] She was undergoing an EEG to evaluate those

---

[41] Tr. 480 [#8-8].

[42] Tr. 480, 483 [#8-8].

[43] Tr. 482 [#8-8].

[44] Tr. 483 [#8-8].

[45] Tr. 482 [#8-8].

[46] Tr. 481-82 [#8-8].

[47] Tr. 483 [#8-8].

[48] Tr. 480 [#8-8].

[49] Tr. 480 [#8-8].

[50] Tr. 486 [#8-8].

6

problems.[51] The physician's notes indicated that the EEG was "normal" in both awake and drowsy states.[52]

Hooke made another visit to Angels on January 3, 2008,[53] shortly after her date last insured. Hooke again complained of daily headaches.[54] The physician's notes indicate that these may have been migraines.[55] Hooke had been off Keppra for two weeks but continued to report memory problems and stated that she felt very forgetful in general.[56] She reported that her depression had been improving on medication.[57] The physician's report also indicated, however, that Hooke denied depression, memory loss, and confusion.[58] The report further indicated that Hooke was alert and cooperative and had a normal attention span and concentration.[59] A mini-mental state examination was conducted and Hooke scored a thirty out of thirty.[60] The notes once again indicated that Hooke denied back pain, joint pain, joint swelling, muscle cramps, muscle

---

[51] Tr. 486 [#8-8].

[52] Tr. 486 [#8-8].

[53] Tr. 488 [#8-8].

[54] Tr. 488 [#8-8].

[55] Tr. 488-92 [#8-8].

[56] Tr. 488 [#8-8].

[57] Tr. 488, 492 [#8-8].

[58] Tr. 490 [#8-8].

[59] Tr. 490 [#8-8].

[60] Tr. 491 [#8-8].

7

weakness, stiffness, arthritis, sciatica, and leg pain.[61] Hooke's gait, reflexes, and strength in her upper and lower extremities were all normal.[62] Neuropsychological testing was ordered.[63]

The results of Hooke's neuropsychological testing were reviewed with her on February 28, 2008.[64] The physician's notes indicate that Hooke was having cognition problems, perhaps due to a combination of small vessel disease and depression.[65] The notes also indicated that her depression was well treated and that she felt better now that she was no longer taking Keppra.[66] An examination revealed that Hooke was fully alert and oriented, had normal memory, and scored a thirty out of thirty on a mini-mental status examination.[67] Additionally, Hooke had normal gait, reflexes, and strength in her upper and lower extremities.[68] Hooke continued to suffer from headaches and occipital neuralgia.[69]

On August 25, 2009, psychologist Michael Maliszewski completed a psychiatric review technique form ('PRTF') based upon a review of Hooke's medical records.[70] Dr. Maliszewski concluded that there was insufficient evidence to substantiate the existence of a severe mental

---

[61] Tr. 490 [#8-8].

[62] Tr. 491 [#8-8].

[63] Tr. 491 [#8-8].

[64] Tr. 493 [#8-8].

[65] Tr. 493 [#8-8].

[66] Tr. 493 [#8-8].

[67] Tr. 494 [#8-8].

[68] Tr. 494 [#8-8].

[69] Tr. 493 [#8-8].

[70] Tr. 297-309 [#8-7].

8

impairment prior to Hooke's date last insured.[71] On November 12, 2009, psychologist Cornelius Kiley completed a PRTF based upon a review of Hooke's medical records and also concluded that there was insufficient evidence.[72]

On January 24, 2011, Dr. Eneyni, one of Hooke's treating physicians, completed a medical source statement.[73] Eneyni explained that Hooke suffered from severe pain that would prevent her from performing a full range of work.[74] Eneyni further stated that Hooke could frequently lift and carry up to twenty pounds and occasionally lift and carry up to fifty pounds.[75] He also explained that Hooke could continuously perform a full range of activities using her hands.[76] Additionally, he opined that Hooke could frequently climb stairs, ramps, ladders, and scaffolds, as well as occasionally stoop, kneel, and crouch.[77] Eneyni stated that Hooke could never crawl.[78] He explained that Hooke could sit, stand, and walk for two hours at a time, but that she could sit, stand, and walk for a combined total of only two hours in an eight-hour work day.[79] Eneyni concluded that Hooke was disabled, and that her disability began on or before December 31, 2007.[80] On May 5, 2011, Eneyni wrote a letter stating that Hooke had been

---

[71] Tr. 297 [#8-7].

[72] Tr. 311-24 [#8-7].

[73] Tr. 878-81 [#8-10].

[74] Tr. 878-81 [#8-10].

[75] Tr. 879 [#8-10].

[76] Tr. 880 [#8-10].

[77] Tr. 880 [#8-10].

[78] Tr. 880 [#8-10].

[79] Tr. 879 [#8-10].

[80] Tr. 878, 881 [#8-10].

9

disabled since 2004 due to lumbrosacral radiculopathy, migraine headaches, greater occipital neuralgia, and cognitive defects.[81]

## C. Hearing Testimony

Hooke testified that she had last worked in approximately 2006 for her son's business.[82] The schedule was very flexible and her son allowed her to leave work when she needed, even for up to a month at a time.[83] In general, she worked between four and six hours per day, two to three days per week.[84] Hooke explained that her job consisted of answering telephones, giving information over the phone, and billing.[85] Hooke had trouble with her billing responsibilities. She often forgot how to do the billing and made mistakes and her son needed to correct her work.[86] Hooke also experienced problems at this job due to back pain and arm pain.[87] Hooke described the pain as a nine out of ten.[88] Although she testified that Oxycodone helped the pain considerably, she explained that it helped for only about four or five hours.[89] Hooke also explained that she was unable to sit for long periods of time due to back pain.[90]

---

[81] Tr. 901 [#8-10].

[82] Tr. 34-35 [#8-2].

[83] Tr. 35-36 [#8-2].

[84] Tr. 35 [#8-2].

[85] Tr. 34-35 [#8-2].

[86] Tr. 56 [#8-2].

[87] Tr. 56-57 [#8-2].

[88] Tr. 57 [#8-2].

[89] Tr. 57-58 [#8-2].

[90] Tr. 35-36 [#8-2].

Prior to working for her son, Hooke was employed for five years as a client representative for a company called Lab Corp.[91] Her job was full-time and consisted primarily of calling hospitals and informing them of blood test results.[92] Before working for Lab Corp., Hooke held similar positions with Medical Lab and another laboratory.[93] Hooke was laid off from all of these positions due to mergers and downsizing.[94]

Since she was laid off from Lab Corp., Hooke has not sought other employment, aside from with her son, due to problems with back pain, leg pain, and tension and migraine headaches.[95] She testified that these problems began in approximately 2002 or 2003.[96] She testified that she experienced a migraine headache every day that lasted anywhere from a few hours to three days.[97] She also experienced regular headaches that lasted between one hour and all day.[98] Hooke had been taking various medications for her headaches but they stopped being effective.[99] Hooke still suffers migraines on a regular basis.[100] As of 2007, Hooke testified that she was receiving injections to treat her migraines and that the injections "cut the headaches down

---

[91] Tr. 38 [#8-2].

[92] Tr. 38-39 [#8-2].

[93] Tr. 40-41 [#8-2].

[94] Tr. 40-41 [#8-2].

[95] Tr. 41 [#8-2].

[96] Tr. 41 [#8-2].

[97] Tr. 42 [#8-2].

[98] Tr. 42 [#8-2].

[99] Tr. 42 [#8-2].

[100] Tr. 43 [#8-2].

11

big time.[101] When she was receiving the shots, she was experiencing migraines only once or twice every two months and the pain was not as intense.[102] The migraines were accompanied by light sensitivity and nausea.[103]

Hooke also testified that she began experiencing neck pain, back pain, dizziness, confusion, and memory loss.[104] Hooke was unsure exactly when she began experiencing neck and back pain.[105] Tests were performed and Hooke was told that the problem was her sciatic nerve.[106] Physical therapy was recommended but Hooke was unable to afford it.[107] Hooke has been taking Percocet and Oxycodone to treat the pain for approximately ten years.[108] These medications provide only temporary relief.[109]

Hooke also suffers from back and lower leg pain, which cause her difficulties in sitting for extended periods of time.[110] She also has trouble climbing up and down stairs and doing

---

[101] Tr. 43-44 [#8-2].

[102] Tr. 44 [#8-2]. Hooke was uncertain how frequently she had experienced migraines while receiving the injections. She initially testified that it was once or twice every two months. Tr. 44 [#8-2]. When questioned by her counsel, however, Hooke agreed that two to three times per week was a more accurate estimate. Tr. 61 [#8-2].

[103] Tr. 61 [#8-2].

[104] Tr. 44 [#8-2].

[105] Tr. 44-46 [#8-2].

[106] Tr. 44 [#8-2].

[107] Tr. 44-45 [#8-2].

[108] Tr. 45-46 [#8-2].

[109] Tr. 46 [#8-2].

[110] Tr. 46 [#8-2].

12

laundry.[111] Hooke also cannot stoop or walk for extended periods.[112] Hooke testified that, as of

the date of the hearing, she had experienced back problems for four or five years.[113]

Hooke also experiences problems with her balance.[114] She suffers from sleep apnea and is

always fatigued, despite using a CPAP machine and getting nine hours of sleep per night.[115]

Hooke also testified that she began suffering from confusion "a few years ago."[116] Hooke does not

receive treatment for her confusion because it is still being tested.[117] Additionally, Hooke suffers

from anxiety, which had affected her for more than five years at the time of the hearing.[118]

Hooke also began suffering from depression prior to 2007.[119]

III.    Analysis

A district court reviewing a final decision of the Commissioner has the "power to enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

the decision of the Commissioner of Social Security, with or without remanding the cause for a

---

[111] Tr. 46 [#8-2].

[112] Tr. 49 [#8-2].

[113] Tr. 46 [#8-2].

[114] Tr. 47 [#8-2].

[115] Tr. 47 [#8-2].

[116] Tr. 47 [#8-2]. Hooke was uncertain when she began having problems with confusion or how it affected her. When Hooke's counsel asked her how long the confusion had been a problem, she stated "three, four years ago." Tr. 63 [#8-2]. She was unable to recall complaining about confusion during 2006. Tr. 63 [#8-2]. Hooke testified that she "just [did not] remember things." Tr. 64 [#8-2]. Although she testified that she could not remember the street on which her former place of work was located, she testified that she could remember how to drive there. Tr. 64    [#8-2].

[117] Tr. 48 [#8-2].

[118] Tr. 48 [#8-2].

[119] Tr. 49, 63 [#8-2].

rehearing."[120] A district court ordinarily may not disturb the Commissioner's findings of fact if they are supported by "substantial evidence."[121] Even if substantial evidence supports the Commissioner's decision, however, a court may review conclusions of law[122] and invalidate findings of fact "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."[123] Resolution of "issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Commissioner]."[124]

A claimant seeking DIB must establish that she is disabled within the meaning of the Social Security Act. A claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[125]

The Commissioner employs a five-step sequential evaluation process to determine whether an individual qualifies as disabled.[126] At step one the hearing officer determines whether

---

[120] 42 U.S.C. § 402(g).

[121] Id.

[122] Slessinger v. Sec'y of Health & Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) (citing Thompson v. Harris, 504 F. Supp. 653, 654 (D. Mass. 1980) (Caffrey, J.)).

[123] Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam)).

[124] Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (quoting Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965)).

[125] 42 U.S.C. § 423(d)(1)(A).

[126] See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

14

the claimant is engaged in substantial gainful activity.[127] If the claimant is not, the hearing officer proceeds to step two, where he determines whether the claimant has a "severe" impairment or combination of impairments.[128] If the hearing officer determines the claimant is severely impaired, he proceeds to step three and considers whether the claimant's impairments meet or equal a listed impairment.[129] If the claimant's impairments do not meet or equal a listed impairment, the hearing officer moves to step four and asks whether the claimant's residual functional capacity ("RFC")[130] allows her to perform any of her past relevant work.[131] Finally, if the claimant is unable to perform her past relevant work, the hearing officer proceeds to step five and determines whether, in light of the claimant's RFC, age, education, and work experience, she is able to adjust to other work.[132]

At each of the first four steps, the claimant bears the burden of proving she is disabled.[133] If the claimant carries her burden during the first four steps, the burden shifts to the Commissioner to prove that the claimant can adjust to other work.[134] A claimant seeking DIB

---

[127] 20 C.F.R. § 404.1520(a)(4)(i).

[128] Id. § 404.1520(a)(4)(ii).

[129] Id. § 404.1520(a)(4)(iii). The regulations contain a list of impairments that are disabling per se. See id. § 404.1520(d).

[130] The hearing officer must determine the claimant's RFC between steps three and four. See id. § 404.1520(a)(4), (e).

[131] Id. § 404.1520(a)(4)(iv). The regulations define "past relevant work" as work the claimant has "done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." Id. § 404.1560(b)(1).

[132] Id. § 404.1520(a)(4)(v).

[133] See, e.g., Goodermote, 690 F.2d at 7.

[134] Rohrberg v. Apfel, 26 F. Supp. 2d 303, 306-07 (D. Mass. 1998) (Freedman, J.).

15

must prove that she was disabled on or before the date she was last insured.[135] Hooke's date last insured was December 31, 2007 and she claims to have become disabled on July 23, 2007.[136] Accordingly, Hooke bore the burden of proving that she was disabled at some point between July 23 and December 31, 2007.

The hearing officer concluded, at step four, that Hooke was not disabled because she was capable of performing her past relevant work.[137] In determining Hooke's RFC, which contributed to his step-four finding, the hearing officer did not accord full weight to Hooke's testimony or to the reports of her treating physician, Eneyni.[138] Hooke argues that the hearing officer misapplied the law when he evaluated Hooke's subjective complaints regarding her symptoms and her credibility. She also argues that the hearing officer ignored evidence.[139] Finally, Hooke argues that the hearing officer erred in concluding that Hooke was not diagnosed with "questionable cognitive deficits" until after her date last insured.[140]

---

[135] 42 U.S.C. § 423(a)(1)(A), (D); <u>Resendes v. Astrue</u>, 780 F. Supp. 2d 125, 139-40 (D. Mass. 2011) (Gertner, J.).

[136] Tr. 183 [#8-5]; Tr. 184 [#8-6]. Hooke initially claimed to have become disabled on January 1, 2003, but later amended that date to July 23, 2007. <u>See</u> Tr. 183 [#8-5]. When the hearing officer asked Hooke's counsel about the reason for this, counsel explained that the date was Hooke's birthday and that Eneyni's medical source statement related to the severity of Hooke's symptoms at that time. Tr. 29 [#8-2].

[137] Tr. 25-26 [#8-2].

[138] <u>See</u> Tr. 21-25 [#8-2].

[139] Mem. Supp. Mot. Reverse & Remand Soc. Sec. Admin. 9 [#16].

[140] Mem. Supp. Mot. Reverse & Remand Soc. Sec. Admin. 12 [#16].

A.    RFC Assessment and Credibility Determination

In considering whether a claimant is disabled, a hearing officer is responsible for determining the claimant's RFC based on the evidence of record.[141] The hearing officer is also tasked with determining whether a treating physician's medical opinions should be accorded controlling weight.[142] A treating physician's opinion on the nature and severity of a claimant's impairments is generally given controlling weight, unless the opinion is inconsistent with substantial evidence in the record.[143] Controlling weight is not accorded to a physician's opinion that the claimant is disabled because that is a determination reserved to the Commissioner.[144]

A hearing officer is also required to consider a claimant's subjective allegations of pain and limitations.[145] A hearing officer is not required to accept those allegations at face value and may reject them where they are unsupported by the medical evidence, treatment history, and activities of daily living.[146] In determining the extent to which a claimant's impairments limit his or her ability to work, a hearing officer must make a finding about the claimant's credibility based upon an evaluation of the entire case record, including the objective medical evidence, the

---

[141] 20 C.F.R. §§ 404.1545, 404.1546(c), 416.945.

[142] Id. § 416.927(d).

[143] Id. § 404.1527(c)(2); see also Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 WL 251000, at *3 (1st Cir. June 9, 1994) (per curiam) ("When a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply.").

[144] 20 C.F.R. § 404.1527(d)(1).

[145] Id. § 416.929(c)(3). The regulations set forth a list of seven factors that should be considered in evaluating the severity of a claimant's impairments. Id. § 416.929(c)(3)(i)-(vii).

[146] Perusse v. Astrue, No. 10-30065-KPN, 2011 WL 1870590, at *5 (D. Mass. Apr. 25, 2011) (Neiman, Mag. J.) (citing Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 194-95 (1st Cir. 1987)).

individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."[147]

The hearing officer should do more than state that the claimant's testimony has been considered and list the relevant factors.[148] Instead, the "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[149] A hearing officer's credibility determination, however, is "given considerable deference and . . . a reviewing court will rarely disturb it."[150] Finally, although the hearing officer must make specific findings about the evidence that caused him to disbelieve the claimant, "he need not march through every single step in his reasoning."[151]

Hooke contends that the hearing officer failed to consider all the relevant evidence relating to her neurological problems and symptoms and failed to fully explain his conclusions. She also submits that the hearing officer failed to sufficiently explain which portions of her testimony he relied upon and which he disregarded in making his RFC assessment.

---

[147] SSR 96-7p, 1996 WL 374186.

[148] Id.

[149] Id.

[150] Ferreira v. Astrue, No. 10-11983-NMG, 2012 WL 1085522, at *7 (D. Mass. Mar. 29, 2012) (Gorton, J.) (citing Anderson v. Astrue, 682 F. Supp. 2d 89, 97 (D. Mass. 2010)).

[151] Anderson, 682 F. Supp. 2d at 97 (citing Da Rosa, 803 F.2d at 26; Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 330 (1st Cir. 1990)).

18

The hearing officer's decision explained that he had considered Hooke's testimony and set forth the seven factors to be considered in making a determination regarding subjective complaints of pain.[152] In addition to simply listing the factors, however, the hearing officer's decision described the evidence of record relevant to each.[153] The hearing officer ultimately determined that Hooke's subjective complaints regarding her impairments and their impact on her ability to work prior to her date last insured were not supported by the medical evidence.[154] Nonetheless, the hearing officer did not completely disregard her subjective complaints and incorporated them into his RFC assessment.[155] The hearing officer determined that although Hooke's impairments were not as severe as she testified, they were more severe than the state agency physicians had determined.[156] He referred to specific evidence in the medical record indicating that there had been little change in Hooke's condition since the alleged onset date of her disability.[157] Although the hearing officer might have included a more robust discussion of his reasons for finding Hooke's testimony less than fully credible, he did cite record evidence in support of his determination. Moreover, his decision regarding the opinion of Hooke's treating physician, discussed below, made clear that the hearing officer considered the medical record. Given the ample deference shown a hearing officer's credibility determinations, this Court cannot say that the hearing officer's determination here was erroneous.

---

[152] See Tr. 22-23 [#8-2].

[153] Tr. 23 [#8-2].

[154] Tr. 23 [#8-2].

[155] Tr. 23-24 [#8-2].

[156] Tr. 25 [#8-2].

[157] Tr. 24 [#8-2] (discussing MRI and spine imaging results).

The hearing officer also supportably accorded Eneyni's opinion less than controlling weight. First, he properly disregarded Eneyni's opinion that Hooke was disabled.[158] Second, the hearing officer explained that he was according Eneyni's opinion less than controlling weight because the opinion was not substantiated by the medical record and the treatment notes were internally inconsistent with Hooke's demonstrated abilities.[159] Although the hearing officer did not cite examples of inconsistency in the record,[160] numerous examples can be readily located.[161] These concerns represent a proper basis for denying the opinion controlling weight.[162]

## B. Exclusion of Cognitive Deficits

The hearing officer determined that through her date last insured Hooke suffered from the following severe impairments: (1) degenerative disc disease; (2) migraine and tension headaches; and (3) diabetes mellitus.[163] Hooke asserts that it was error for the hearing officer not to include her "questionable cognitive deficits" in this list on the basis that the diagnosis did not arise until after Hooke's date last insured. The record indicates that neuropsychological testing was not ordered until January 3, 2008.[164] Moreover, Hooke concedes that the words 'cognitive problems'

---

[158] See 20 C.F.R. § 404.1527(d)(1); Tr. 24 [#8-2].

[159] Tr. 24 [#8-2]. The regulations explain that supportability and consistency are two factors used in determining how much weight to assign to medical opinions. 20 C.F.R. § 416.927(c)(3)-(4).

[160] See Gordils, 921 F.2d at 330 (noting that record supported hearing officer's decision even though the hearing officer did not refer to it).

[161] Physician's notes repeatedly indicated that Hooke denied having back pain, joint pain, and the like. See Tr. 475, 481-82, 490 [#8-8]. They also indicated that Hooke repeatedly denied memory loss. See Tr. 475, 482, 490 [#8-8]. Finally, several examinations revealed that Hooke had normal gait, reflexes, coordination, and muscle strength. See Tr. 476, 482, 490-91, 494 [#8-8].

[162] See 20 C.F.R. § 416.927(c)(3)-(4).

[163] Tr. 19 [#8-2].

[164] Tr. 491 [#8-8].

20

do not appear in the records until February 28, 2008.[165] Nonetheless, Hooke contends that the

February 28, 2008 diagnosis is clearly related to the memory and confusion issues that appeared

in physician's notes prior to her date last insured. Even assuming that Hooke is correct, the record

indicates these problems may have been limited prior to her date last insured. The physician's

notes contradictorily state both that she reported memory problems, possibly due to Keppra, and

that she denied having memory loss.[166] Various tests performed before her date last insured also

came back normal.[167] It is thus incorrect to conclude that the hearing officer's finding on this

matter "is misleading, erroneous, and [] not based on evidence presented at the hearing."[168] The

hearing officer did not err in finding that Hooke's memory problems did not rise to the level of a

severe impairment prior to her date last insured.

IV.    Conclusion

       For the foregoing reasons, Hooke's Motion to Reverse and Remand to the Social Security

Administration [#15] is DENIED and the Administration's Motion to Affirm the Commissioner's

Decision [#19] is ALLOWED.

AN ORDER HAS ISSUED.

William A. Young
United States District Judge

---

[165] See Tr. 493 [#8-8].

[166] Tr. 474-90 [#8-8].

[167] Even the physician's notes from February 28, 2008 state that an examination revealed Hooke
to be fully alert and oriented and that her memory and orientation were normal. Tr. 493-94 [#8-8].
Hooke also scored a thirty out of thirty on a mini-mental state examination on that date. Tr. 494
[#8-8].

[168] Mem. Supp. Mot. Reverse & Remand Soc. Sec. Admin. 13 [#16].

21